UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

FRANK E. PETERS,

        Defendant.

**DECISION AND ORDER**
03-CR-211S

## I. INTRODUCTION

On October 22, 2003, a federal grand jury returned an 18-count Indictment against Defendant Frank E. Peters and his co-defendants, Mark Hoffman[1] and Gregory Samer,[2] relating to an alleged scheme to defraud Chase Manhattan Bank ("Chase"), a federally-insured financial institution. (Docket No. 1.) Peters controlled two corporate entities — World Auto Parts, Inc., and Big Horn Core, Ltd. — that had an asset-based revolving line of credit with Chase. In short, the government charged that the defendants conspired to defraud Chase by falsely overvaluing assets used to secure and maintain the revolving line of credit.

On July 30, 2007, after a ten week trial, the jury convicted Defendant Frank E. Peters of one count of conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 371 and 2; one count of making a false statement to a bank in violation of 18 U.S.C. §§ 1014 and 2; one count of bank fraud in violation of 18 U.S.C. §§ 1344 and 2; two counts of wire

---

[1]The jury acquitted Hoffman of all counts against him. (Docket No. 274, 338.)

[2]Samer, who testified against Peters and Hoffman at trial, pled guilty on February 4, 2005, and was sentenced to 18 months imprisonment on October 15, 2007. (Docket Nos. 60, 308.)

1

fraud in violation of 18 U.S.C. §§ 1343 and 2; and one count of mail fraud in violation of 18 U.S.C. §§ 1341 and 2. (Docket No. 338.)

The jury acquitted Peters of three other counts of making a false statement to a bank in violation of 18 U.S.C. §§ 1014 and 2, and at the conclusion of the government's proof, this Court dismissed a single count of money laundering in violation of 18 U.S.C. §§ 1957 and 2, and three counts of bank fraud in violation of 18 U.S.C. § 1344, pursuant to Rule 29 of the Federal Rules of Criminal Procedure. (Docket Nos. 254, 255, 270, 338.)

Presently before this Court is Peters's Motion for a New Trial based on newly discovered evidence, pursuant to Rule 33 and Brady v. Maryland.[3] 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). (Docket No. 479.) The government opposes the motion. For the reasons discussed below, Peters's motion is denied.

### III. DISCUSSION

**A.   Rule 33**

Rule 33 authorizes the court to "vacate any judgment and grant a new trial if the interest of justice so requires." Eberhart v. United States, 546 U.S. 12, 13, 126 S.Ct. 403, 403, 163 L.Ed.2d 14 (2005) (per curiam). A new trial based on newly discovered evidence is granted "only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal." United States v. Alessi, 638 F.2d 466, 479 (2d Cir. 1980).

"In evaluating a Rule 33 motion based on newly discovered evidence, a court must 'exercise great caution' and order a new trial 'only in the most extraordinary

---

[3]The submissions relevant to this motion are docket numbers 479, 480, 506, 508, 514, and 516.

2

circumstances.'" United States v. Collins, No. 07 Cr. 1170, 2010 WL 743178, at *1 (S.D.N.Y. Mar. 3, 2010) (quoting United States v. Zagari, 111 F.3d 307, 322 (2d Cir. 1997), in turn quoting, United States v. Spencer, 4 F.3d 115, 118 (2d Cir. 1993)). The new evidence proffered in support of a Rule 33 motion must be admissible at trial. See United States v. Parker, 903 F.2d 91, 103 (2d Cir. 1990). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be manifest injustice." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001).

**B.      Maryland v. Brady**

In Brady, the United States Supreme Court held that "the suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Subsequent cases have eliminated the requirement that a defendant request exculpatory evidence. See United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

Brady is violated when the government suppresses favorable material evidence "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 432. A Brady violation has three components: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

**C.      Newly Discovered Evidence**

Peters contends that newly discovered evidence concerning five specific areas

warrants a new trial. The government responds that the evidence Peters cites is not newly discovered and does not warrant the granting of a new trial. Each category of evidence is discussed below.

### 1. Evidence Relating to Williams Technologies

Peters contends that newly discovered evidence disclosed in civil litigation demonstrates that Chase knew about overstated financial statements and pre-billing practices at World Auto Parts as early as 1999. "Exhibit 212" is a document produced in civil litigation arising out of the collapse of World Auto Parts. The state court civil litigation was stayed at the government's request as the criminal case against Peters proceeded to trial. As a result, Samer was not deposed until after Peters's conviction. Exhibit 212 was used during Samer's deposition. (See Docket No. 479-22.)

Exhibit 212 bears a "JPMorganChase" heading and is entitled "World Auto Parts May 10, 1999 Report Williams Technologies." (Id.) It is marked as "PET16056." (Id.) Written by hand on the second page of the document is the following notation: "$500M reverse to recognize amount of sales in 1998 that reflected bill & hold shipments made in 1999." (Id.) According to Peters, this notation read in conjunction with the information in Exhibit 212 indicates that sales for 1999 were overstated by $1,000,000, but then partially corrected by reversing the "$500M" as noted.

Along with Exhibit 212, Peters contends that unproduced files from 1999 and 2000 from Ernst & Young (the accounting firm that audited World Auto Parts) contain relevant and exculpatory documents related to its 1999 audit and preliminary examination of World Auto Parts's records. Peters contends that these documents show that both Chase and Ernst & Young knew that World Auto Parts materially overstated its sales and earnings in

4

1998, and that they colluded to only partially correct the overstatement related to Williams Technologies (the "$500M" reversal).

Peters contends that this newly discovered documentary evidence is buttressed by previously unknown and unavailable testimony from Robert Fraass, Kenneth Colwell, and William Plarr. Robert Fraass was an auditor employed by Ernst & Young and was the senior field staff person on site at World Auto Parts. He testified at his deposition that he wrote the "$500M" reversal instruction on Exhibit 212. He further testified that he did not inform Peters, Marta Chaikovska (Peters's wife), or the Board of Directors of World Auto Parts about the overstatements. Peters maintains that testimony from Colwell (a partner at Ernst & Young) and Plarr (Samer's assistant) would support the contention that Chase and Ernst & Young knew about the accounting irregularities at World Auto Parts.

In particular, Peters argues that Plarr, who shared an office with Samer and was his assistant from 1995 to 1999, provided exculpatory testimony at his civil deposition. Plarr testified that Chase and the Buffalo managers at World Auto Parts knew that Samer was overstating the company's financial health. Peters contends that Plarr's testimony contradicts Samer's testimony at the criminal trial, because Plarr stated that Peters had no knowledge of these accounting practices. Peters also maintains that Plarr heard Samer and John Hariaczyi (a Chase employee) discussing the pre-billing that resulted in the overstatements, thus demonstrating that Chase knew of and acquiesced in the practice. Contrary to Samer, Plarr also indicated that pre-billing was not discussed at management meetings or with Peters.

In Peters's view, this newly discovered evidence supports his contention that Chase knew that World Auto Parts's sales were being overstated. Peters maintains that this evidence and information is all new to him. He claims that he never received Exhibit 212

5

or the Ernst & Young files, despite them being responsive to pretrial subpoenas he served on both Chase and Ernst & Young. Moreover, he contends that the government effectively blocked him from gathering sworn statements from or interviewing Fraass, Colwell or Plarr, because it placed them on its witness list, secured a stay of the civil proceedings (including depositions), and used the fact that these individuals were represented by Ernst & Young or Chase lawyers to further impede contact. Peters maintains that he is entitled to a new trial because this new evidence shows that Chase knowingly accepted the risks that accompany lending to an entity whose revenue was overstated and whose collateral was less than required to secure the loan.

The government maintains that none of this evidence is new or was unavailable at the time of the criminal trial. According to the government, "Exhibit 212" is a document that Peters forged and then produced in the course of discovery in the civil proceedings, as evidenced by the "PET16056" designation. (Wylegala Aff., Docket No. 508, ¶¶ 8-14.) In addition, the "JPMorganChase" heading on the May 1999 document references a corporate name that Chase did not begin using until November 2001. (Wylegala Aff., ¶¶ 13, 14.) Because Peters produced this document to Chase in March 2006, the government asserts that he forged this cover sheet. The government further maintains that the Ernst & Young work papers were made available for Peters's inspection before the criminal trial began, and in fact, Peters inspected them in May 2006. (Wylegala Aff., ¶ 16.) Finally, the government argues that Fraass, Colwell, and Plarr, were available as witnesses for Peters to call and that Peters could have subpoenaed them to testify at trial. And, the government notes, Fraass and Colwell were on Peters's witness list.

As it pertains specifically to Plarr, Peters contends that the government failed to turn

over an FBI 302 from a conversation between Plarr and several FBI agents. The FBI interviewed Plarr on October 19, 2000, and an FBI 302 memorializing this conversation was produced to Peters. But Plarr contacted the FBI again after a defense investigator attempted to speak with him, which prompted another interview with FBI agents. Peters maintains that the government never produced an FBI 302 from this second meeting, in violation of its <u>Brady</u> obligations. The government argues that it was not required to disclose the FBI 302, because Platt was not a witness and no exculpatory information was contained therein.

### 2. Evidence Relating to ITEC

Ernst & Young partner Kenneth Colwell prepared a memorandum dated January 19, 2000, for his personal client files, which details a meeting he had with Peters and Chaikovska on January 15, 2000. Peters maintains that Ernst & Young failed to produce this document in response to the pretrial subpoena, and based on the file designation on the document,[4] further alleges that Ernst & Young either withheld responsive documents or failed to electronically search for them. According to Peters, this memorandum is significant because it demonstrates that Peters was openly discussing his corporate reorganization plans, particularly as to a company called ITEC, contrary to trial testimony by Hariaczyi, who could not confirm whether any reorganization discussions took place. Thus, with the benefit of this evidence, argues Peters, the jury could have determined that he disclosed his ITEC plans to Chase, and therefore, did not defraud the bank.

The government contends that these documents were provided to Peters, both

---

[4]The document contains the path and filename of "sys 1 on buf gen T/clients/world auto parts/memo re 1-15-00 discussion with frank peters." Peters maintains that an electronic search for responsive documents would have revealed this document, given that the filename contains the terms "world auto parts" and "frank peters."

7

electronically and in hard copy, in advance of trial as part of the government's disclosure required by 18 U.S.C. § 3500. (Wylegala Aff., ¶¶ 17, 18.)

    3.    **Evidence Relating to the ATCO Letter**

During the criminal trial, Peters introduced Defense Exhibit D-18, referred to now as the ATCO letter. This is a single-page, double-sided letter from Peters to "ATCO," one of World Auto Parts's customers. Peters disclosed this document to the government, and at trial, the government requested the original document to test. An FBI agent subsequently contacted the manufacturer of the paper upon which the ATCO letter was printed, and it confirmed that the watermark on the paper was in use since February 1995.

According to Peters, the government tested the ATCO document, hoping that the results would show that the watermark post-dated the date of the letter, thus demonstrating a forgery. When it did not, the government reported to Peters that the testing was "inconclusive." Nothing further was turned over. In closing arguments, the prosecutor argued to the jury that the ATCO letter was a fabrication.

After trial, Peters requested information concerning the government's testing of the ATCO letter and requested access to the original to perform his own testing. The government turned over the FBI 302, which memorialized its contact with the paper manufacturer. Ink testing performed by the defense resulted in an opinion that the letter was created on the date it bears, which supports Peters's position that the letter was not fabricated.

Peters argues that because the testing did not support the government's theory, the FBI 302 memorializing the contact with the paper company should have been produced as Brady material. He also argues that if he knew the government had not actually tested


8

the document, he could have tested the ATCO letter during the trial to rebut the government's suggestion that it was a fabrication.

In response, the government argues that Peters was on notice well before its closing that it considered the ATCO letter a fake because it disclosed an FBI 302 concerning Sam Lugo, who denied ever receiving the letter or having the conversations with Peters that are referenced. The government further argues that its failure to provide Peters with the FBI 302 memorializing the conversation with the paper manufacturer does not violate Brady because Peters had an equal opportunity to test the document and the results of the government's inquiry — that the watermark was in use since 1995 — is not exculpatory. Finally, the government contends that the post-trial expert testing of the ATCO letter commissioned by Peters does not constitute newly discovered evidence warranting a new trial.

### 4. Evidence Relating to Chase's Small Business Administration Guarantee

In August 1999, shortly after "Exhibit 212" was allegedly created, Chase applied to the United States Small Business Administration ("SBA") for a guarantee of a $1,000,000 loan it proposed to make to World Auto Parts. Hariaczyi arranged for this loan guarantee on Chase's behalf and submitted the required information and documentation to the SBA. In September 1999, the SBA agreed to guarantee the $1,000,000 loan from Chase to World Auto Parts.

Peters contends that Hariaczyi perjured himself at trial by testifying that he fully informed the SBA about World Auto Parts's financial condition, including accounting overstatements and the pre-billing practice. According to Peters, the SBA files disclosed in the civil litigation and made available to him after his conviction reveal that the SBA

9

never received certain field examination reports and that a report prepared by Chase as an "Annual Review" of World Auto Parts did not disclose the accounting irregularities. Moreover, Peters contends that the SBA files show that contrary to Hariaczyi's testimony, and individual named Al Boyce, not Hariaczyi, was the Chase contact person for the SBA backing.

Peters maintains that the government received the SBA files in August 2000, and had them in its possession at the time Hariaczyi testified, and thus knew that Hariaczyi's testimony was false, yet it did not reveal that to Peters or this Court. Peters maintains that this information should have been disclosed as Brady material. Peters also argues that the SBA records show that Hariaczyi perjured himself as it relates to Chase's securing of the $1,000,000 SBA loan. Peters argues that the government knew that Hariaczyi was lying and had an obligation under Brady to disclose that fact so that the defense could move to strike the testimony and expose Hariaczyi's lies.

The government argues that Peters received the SBA file as part of the pretrial discovery. It maintains that it made available the file produced by the SBA in response to the grand jury subpoena, and that Peters therefore had full and complete access to the SBA file before trial. It further contends that Hariaczyi was available to Peters before trial and in fact testified at a deposition in 2004. The government also rejects Peters's claim that Hariaczyi perjured himself, and notes that defense counsel had three days to test and attack Hariaczyi's credibility.

### 5. Evidence Relating to Gregory Samer's Post-Trial Employment

Finally, Peters argues that evidence discovered after trial concerning Samer's employment subsequent to World Auto Parts would have bolstered his position concerning

10

a line of evidence he was precluded from introducing at trial concerning Samer's alleged accounting malfeasance. At Samer's sentencing, it was revealed that he had engaged in deficient accounting methods during his subsequent employment at Oneida Sales and Services, Inc., about which the government was aware, but did not reveal to the defense. Peters maintains that the government never produced this evidence. Had it done so, according to Peters, his chances of having this evidence admitted at trial under Federal Rule of Evidence 404(b) to show that Samer repeatedly engaged in accounting fraud would have been increased.

The government argues that Peters was aware of Samer's employment history because it was the subject of this Court's pretrial ruling. That ruling, according to the government, continues to make any purported evidence on the subject inadmissible.

**D. Analysis**

In this Court's view, Peters has failed to meet his burden of demonstrating that material, non-cumulative, newly discovered evidence exists that would likely lead to an acquittal. See Alessi, 638 F.3d at 479. A new trial is therefore not warranted.

First, as it relates to "Exhibit 212," the Ernst & Young "work papers," the Colwell memorandum relating to ITEC, and the SBA files, Peters has not carried his burden of demonstrating that these documents are newly discovered. To the contrary, it appears from the record that these documents were available to Peters before his trial. Exhibit 212 was provided by Peters to Ernst & Young and was used by Peters at trial[5] (Wylegala Aff., ¶¶ 8, 9, 11, 12); the Ernst & Young "work papers" were inspected by Peters in May 2006

---

[5]This Court need not reach whether the cover sheet of Exhibit 212 is a fabrication because the handwritten notes, which Peters maintains are material to his new trial motion, are contained elsewhere in the exhibit.

11

(Wylegala Aff., ¶ 16); the Colwell memorandum was produced in advance of trial (Wylegala Aff., ¶ 18); and the SBA files were made available to Peters before trial (Wylegala Aff., ¶ 24.)

Although Peters maintains that he cannot confirm the government's representations regarding disclosure,[6] it is his burden to demonstrate that this evidence is newly discovered. In his reply papers, Peters does not persuasively refute the government's representations regarding disclosure, but instead argues that the government's representations may not be correct, that disclosure may not have been complete, or that certain disclosure was unfairly "buried." (Grable Aff., Docket No. 514, ¶¶ 8, 22, 33). Such general claims of non-disclosure, however, are insufficient to meet Peters's burden of demonstrating that the evidence he now relies on is new and was unavailable before trial. Accordingly, this Court finds that "Exhibit 212," the Ernst & Young "work papers," the Colwell memorandum relating to ITEC, and the SBA files, were disclosed and available before trial and therefore do not constitute new evidence warranting a new trial under Rule 33. See United States v. Owen, 500 F.3d 83, 89-90 (2d Cir. 2007) (noting that one cannot "discover" evidence after trial that he or she was aware of before trial).

Second, as it relates to the testimony of Fraass, Colwell, and Plarr, Peters has failed to persuasively demonstrate that these witnesses were unavailable to him. Although these witnesses may not have been *readily* available to him given the government's involvement in the stay of the civil proceedings, they were available nonetheless. Moreover, Peters knew each of these witnesses, and therefore knew that they may have had information

---

[6]To the extent Peters maintains that he is not in possession of the original trial exhibits and is therefore unable to confirm the government's representations, this Court notes that it has received no requests from Peters to examine the original trial exhibits.

12

about his case. Peters concedes that he attended Fraass's deposition, which took place before the start of the criminal trial (Grable Aff., ¶ 9), and he included both Colwell and Fraass on his witness list but did not call them to testify (Wylegala Aff., ¶ 35). No proof has been submitted that Peters was actually prevented from offering these witnesses at trial. Accordingly, because Peters knew that these individuals may have possessed knowledge pertinent to his case and he was not prevented from calling them as trial witnesses, they are not newly discovered and a new trial is not warranted. See United States v. Pordum, 451 F.2d 1015 (2d Cir. 1971) (per curiam) (holding that failure to call witnesses known to the defense did not warrant new trial).

Third, Peters's claim that exculpatory evidence was withheld by the government in violation of Brady is unfounded. Peters argues that the testing done on the ATCO letter, the failure to produce the second FBI 302 involving Plarr, and the failure to reveal Hariaczyi's testimony as perjury, all constitute exculpatory information that the government failed to provide. None of it, however, triggers the government's Brady obligations. The government's discovery that the watermark on the ATCO letter was consistent with the date it was allegedly authored is not exculpatory; it does not tend to establish Peters's innocence. Moreover, Peters had an equal opportunity to perform whatever testing on the ATCO letter he deemed necessary, but instead freely elected to rely on his assumption that the government had conducted ink testing.

The same holds true for the second FBI 302 involving Plarr and the Hariaczyi testimony — Peters has failed to demonstrate that it constitutes exculpatory evidence. According to the government, the FBI's second interview with Plarr revealed no exculpatory evidence and Plarr was never called as a witness. (Wylegala Aff., ¶ 49.) Disclosure of the

13

second FBI 302 was therefore not required. See United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004) (identifying the existence of exculpatory evidence as the first element of a Brady violation).

And as to Hariaczyi, Peters cross-examined him for three days and had the SBA file that he now argues proves that Hariaczyi perjured himself. There is no evidence that the government blocked Peters's pretrial access to Hariaczyi. And Peters has not demonstrated that Hariaczyi perjured himself, much less that the government knew of the perjury. See United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991). The existence of inconsistent statements by other witnesses does not demonstrate perjury. Cf. United States v. Petrillo, 237 F.3d 119, 123 (2d Cir. 2000) (involving additional testimony that arguably made primary testimony misleading, at best, not demonstrably false).

Fourth, the evidence relating to Samer's subsequent employment with Oneida Sales and Services, most particularly the testimony of Fred Saia, is not cause for a new trial. Peters knew of Samer's employment history before trial and the issue was the subject of a pre-trial ruling. The additional discovery of consistent information, which was deemed inadmissable at trial, is not cause for the granting of a new trial. See Parker, 903 F.2d at 103 (holding that proffered new evidence must be admissible at trial).

Finally, even if Peters could demonstrate that the evidence he now relies on is newly discovered, this Court finds that it would not result in an acquittal. See Romero v. United States, 28 F.3d 267, 268 (2d Cir. 1994). Even viewing the allegedly new evidence in Peters's favor, it can only be said that it would strengthen his defense — none of the evidence cited, viewed independently or cumulatively, would lead to an acquittal. Thus, "the most extraordinary circumstances" do not exist and the granting of a new trial is not required. United States v. Imran, 964 F.2d 1313, 1318 (2d Cir. 1992).

## IV. CONCLUSION

Peters has not established that a manifest injustice would occur by letting the guilty verdict stand. Consequently, a new trial is not warranted and Peter's motion is therefore denied. See Ferguson, 246 F.3d at 134.

## V. ORDER

IT HEREBY IS ORDERED, that Defendant's Motion for a New Trial (Docket No. 479) is DENIED.

SO ORDERED.

Dated: December 21, 2010
       Buffalo, New York

                                      /s/William M. Skretny
                                      WILLIAM M. SKRETNY
                                      Chief Judge
                                        United States District Court