UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FRANK E. PETERS,

                         Petitioner,

        v.                                              **DECISION AND ORDER**
                                                        15-CV-505S
UNITED STATES OF AMERICA,                               03-CR-211S (1)

                         Respondent.


## I. INTRODUCTION

Presently before this Court is petitioner Frank E. Peters's pro se[1] Motion to Vacate,

Set Aside, or Correct his Sentence under 28 U.S.C. § 2255.  (Docket No. 596.[2])  For the

reasons discussed below, Peters's motion is denied.

## II. BACKGROUND

**A.      Facts[3]**

Peters and his wife, Marta Chaikovska, purchased World Auto Parts, Inc. ("WAPI")

in 1990.  In 1995, WAPI acquired a company Peters and his wife renamed Bighorn Core,

Ltd. ("Bighorn").  WAPI and Bighorn (together, the "Companies") sold aftermarket auto

parts.  Chaikovska was WAPI's chief executive officer and owned 85 percent of the

---

[1] Because Peters is an attorney, he is not entitled to the special solicitude ordinarily afforded a pro se litigant.  See Tracy v. Freshwater, 623 F.3d 90, 101-02 (2d Cir. 2010) (citing Holtz v. Rockefeller & Co., 258 F.3d 62, 82 n. 4 (2d Cir. 2001)).

[2] All docket citations are to the criminal case: 03-CR-211S (1).

[3] The facts are repeated from the Second Circuit's decision in United States v. Peters, 732 F.3d 93, 95-98 (2d Cir. 2013.)

Companies.  Peters was the president and owned 13 percent.  Peters's sister-in-law owned one percent, and a fourth individual, Peter Van Domelen, owned one percent.

*The Chase Loan*

In 1996, the Companies entered into an asset-based credit agreement with Chase [Manhattan Bank ("Chase")] in which the bank agreed to extend to the Companies a $9 million revolving line of credit secured by the Companies' assets.  In June 1998, the parties renewed the agreement for two years, raising the available credit to $10.5 million. The cash available to the Companies on any given day was determined by the Companies' "borrowing base": the sum of the values of the Companies' inventory and accounts receivable.  The Companies were permitted under their arrangement with the bank to borrow up to an amount equal to 85 percent of the value of current accounts receivable, plus 60 percent of the value of the current inventory, less whatever loan principal was outstanding (never to exceed the $10.5 million maximum).

The loan agreement provided that the Companies would deposit all payments from customers into "blocked" accounts at Chase, from which only the bank could make withdrawals.  Chase would then "sweep" the accounts periodically, using the money taken from them to pay down the Companies' loan balance.

Certain accounts receivable were deemed "ineligible" for purposes of determining the borrowing base because the bank considered it unlikely that those amounts would be repaid.  For example, the Companies were not permitted to borrow against accounts receivable more than 90 days past due or purchase orders that had not yet been fulfilled. The Companies would periodically file a "borrowing base report," which was supposed to reflect the combined value of accounts receivable and inventory.  To confirm the

information in the borrowing base report, and to verify generally the Companies' accounting standards, Chase "field examiners" were permitted to audit random samples of the Companies' records. One such field examiner, Edward Grayeski, testified at trial that he had conducted field tests between 1996 and 1998, and that his review raised red flags with respect to some of the accounts receivable. Although the Companies were initially able to deflect the bank's concerns about the accuracy of their records, examiners eventually uncovered the fraudulent scheme, described below, that underlies this case.

*The Scheme*

Peters does not dispute that the Companies engaged in a fraudulent scheme to manipulate the accounts receivable in order to inflate their borrowing base. Starting sometime in 1997, the Companies began experiencing cash-flow shortages due to a low sales volume. In response, the Companies developed ways to increase cash flow. Gregory Samer, a WAPI employee who pleaded guilty under the same indictment that named Peters as a defendant, testified as a cooperating witness at Peters's trial. Samer detailed three different fraudulent accounting practices committed by Peters and the Companies in order to increase the cash available through the Chase loan: (1) "holding the month open"; (2) "prebilling"; and (3) "rebilling."

The practice of "holding the month open" consisted of including in a particular month an account receivable that did not actually ripen until the following month. For example, Samer might instruct Cheryl Martinez, who worked in WAPI's billing department, to include invoices from the first two weeks of February in the January Accounts Receivable Report. Martinez would then backdate what should have been a February invoice to make it appear as though the goods sold had been shipped in January. If the

product did eventually ship to the customer, Martinez would produce a hand-typed invoice that reflected the actual date of shipment.

"Prebilling" referred to the practice of creating a sales invoice for an order before any goods were shipped, thereby making an unripe purchase order appear to be an account receivable. For example, in January 2000, a company named ATCO placed a purchase order with Bighorn for $850,000 worth of air-conditioning cores. Bighorn lacked both the inventory to fulfill the order and sufficient cash to purchase the inventory. Employees at Bighorn created an invoice falsely indicating that the ATCO order had shipped, which allowed them to include an $850,000 order in the Accounts Receivable Report for that month. As a result, Chase was duped into lending the Companies more money—money that Chase expected to be repaid through a sale that, in fact, might never come to fruition.

The practice of "rebilling" was, in effect, an end-run around Chase's policy of excluding accounts receivable that were more than 90 days old from the borrowing base. Employees at the Companies would generate a new invoice for an old sale with a false date somewhere within the previous 90 days so that the receivable could be included in the borrowing base report.

Although there was evidence in the record that Chase was aware of at least some of these practices, the bank appears to have been unaware of the extent to which the Companies' employees were artificially inflating the Companies' borrowing base. Chase ultimately uncovered the full extent of the fraud in or around May 2000, when a Bighorn employee named Ron Hall disclosed it to Chase examiners.

*The Creation of ITEC*

In early 2000, Peters created a corporation named Innovative Transmission and Engine Company ("ITEC") into which he spun off the Companies' heavy-duty equipment department. Peters opened a bank account for ITEC at another institution, M&T Bank. Several customers who had sent payments to WAPI were sent correspondence informing them that WAPI had changed its name and asking that the payment be reissued to ITEC. The reissued checks were deposited in ITEC's account at M&T Bank, instead of in the Companies' Chase accounts, where the loan agreement required that such payments be deposited. Chase was thus deprived of money that was supposed to have been used to pay down the loan.

## B.    Procedural History

On October 22, 2003, a federal grand jury returned an 18-count indictment against Peters and his co-defendants, Mark Hoffman and Gregory Samer,[4] relating to the scheme to defraud Chase, a federally-insured financial institution. (Docket No. 1.) The government charged that Peters, Hoffman, and Samer conspired to defraud Chase by falsely reporting assets used to secure and maintain the revolving line of credit, as described above.

On July 30, 2007, after a 10-week trial, the jury convicted Peters of one count of conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 371 and 2; one count of making a false statement to a bank in violation of 18 U.S.C. §§ 1014 and 2; one count of bank fraud in violation of 18 U.S.C. §§ 1344 and 2; two counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2; and one count of mail fraud in violation of 18 U.S.C. §§ 1341

---

[4] Samer, who testified against Peters and Hoffman at trial, entered a guilty plea to Count 1 of the 03-CR-211S indictment on February 4, 2005, and was sentenced to 18 months' imprisonment on October 15, 2007. (Docket Nos. 60, 308.)

and 2. (Docket No. 338.) The jury acquitted Peters of three other counts of making a false statement to a bank in violation of 18 U.S.C. §§ 1014 and 2, and at the conclusion of the government's proof, this Court dismissed a single count of money laundering in violation of 18 U.S.C. §§ 1957 and 2, and three counts of bank fraud in violation of 18 U.S.C. § 1344, pursuant to Rule 29 of the Federal Rules of Criminal Procedure. (Docket Nos. 254, 255, 270, 338.) The jury acquitted Hoffman of all counts against him. (Docket No. 338.)

On November 15, 2007, this Court denied Peters's motion to arrest judgment on the conspiracy count, finding as it had previously that the count did not charge three distinct conspiracies and therefore was not duplicitous. (See Docket Nos. 65, 79, 254, 255, 270, 319.)

On December 21, 2010, this Court denied Peters's motion for a new trial premised on newly discovered evidence and alleged Brady violations. (Docket No. 537.)

On January 27, 2011, this Court sentenced Peters to 108 months' imprisonment and 3 years' supervised release and ordered him to pay $11,988,501.36 in restitution and $23,154,259 in forfeiture. (See Docket Nos. 551, 552; United States v. Peters, 257 F.R.D. 377 (W.D.N.Y. 2009) (ordering forfeiture).)

On October 9, 2013, the United States Court of Appeals for the Second Circuit affirmed the convictions, sentence, restitution, and forfeiture determinations in a summary order and a precedential opinion, each issued on October 9, 2013. See United States v. Peters, 543 F. App'x. 5 (2d Cir. Oct. 9, 2013) (summary order) (convictions, sentence, restitution); United States v. Peters, 732 F.3d 93 (2d Cir. 2013) (forfeiture).

In its summary order affirming Peters's convictions and sentence, the Second

Circuit rejected Peters's arguments that (1) the conspiracy count was duplicitous; (2) the evidence as to all counts of conviction was insufficient; (3) cumulative evidentiary errors denied him a fair trial; and (4) the loss calculation was incorrect. See Peters, 543 F. App'x. at *7. Instead, it found "ample evidence" that Peters was personally involved in the fraudulent practices underlying the conspiracy, false statement, and bank fraud counts, and that the government presented sufficient evidence that Peters caused the transmission of communications intended to divert funds that properly belonged to Chase for purposes of the wire and mail fraud counts. Id. at *8-9, 10.

On June 9, 2014, the United States Supreme Court denied Peters's petition for writ of certiorari. See Peters v. United States, 134 S. Ct. 2740, 189 L. Ed. 2d 776 (2014).

On June 8, 2015, Peters timely filed the instant § 2255 motion,[5] which the government opposes. (Docket Nos. 596, 604, 605, 609, 610.) This Court took the motion under advisement without oral argument on March 21, 2016.

### III. DISCUSSION

**A.    § 2255 Proceedings**

Twenty-eight U.S.C. § 2255 allows federal prisoners to challenge the legality of their sentences. It provides, in pertinent part, that:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255 (a).

---

[5] A 1-year statute of limitations applies to § 2255 petitions. See 28 U.S.C. § 2255 (f).

Importantly, a § 2255 motion is not a substitute for an appeal.  See Bousley v. United States, 523 U.S. 614, 621, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998) ("Habeas review is an extraordinary remedy and 'will not be allowed to do service for an appeal.'") (quoting Reed v. Farley, 512 U.S. 339, 354, 114 S. Ct. 2291, 2300, 129 L. Ed. 2d 277 (1994)).  Relief under § 2255 is therefore narrowly limited, with collateral attack on a final criminal judgment available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in complete miscarriage of justice." Graziano v. United States, 83 F.3d 587, 589-90 (2d Cir. 1996) (per curiam) (quoting United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995) (internal quotation marks omitted)).  This narrow limitation preserves respect for finality, allows for the efficient allocation of judicial resources, and recognizes an aversion to retrying issues long after they occur.  See Bokun, 73 F.3d at 12 (citations omitted).

To shape the narrow relief available under § 2255, two procedural rules apply to make it more difficult for a defendant to upset a final criminal judgment on collateral review.  See Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010).  First, the "mandate rule" bars re-litigation of issues already decided on direct appeal.  See id.; see also Burrell v. United States, 467 F.3d 160, 165 (2d Cir. 2006); United States v. Perez, 129 F.3d 255, 260 (2d Cir. 1997) ("[I]t is well-established that issues decided on direct appeal may not be re-litigated in the context of a petition under § 2255.")  This includes "not only . . . matters expressly decided by the appellate court, but also . . . re-litigation of issues impliedly resolved by the appellate court's mandate." Yick Man Mui, 614 F.3d at 53 (citing United States v. Ben Zvi, 242 F.3d 89, 95 (2d Cir. 2001)).  This rule also bars

ineffective-assistance-of-counsel claims that were raised and resolved on direct appeal, as well as those involving factual predicates that while not explicitly raised on direct appeal, were impliedly rejected by the appellate court mandate.  See id. at 53-54 (citations omitted).  An exception to this rule exists for cases involving intervening changes in the law, in which case the petitioner "must show that there is new law which, when applied to their claims, would result in a different disposition."  Chin v. United States, 622 F.2d 1090, 1092 (2d Cir. 1980) ("Reconsideration [of claims previously raised on direct appeal] is permitted only where there has been an intervening change in the law and the new law would have exonerated a defendant had it been in force before the conviction was affirmed on direct appeal.") (citing United States v. Loschiavo, 531 F.2d 659, 664 (2d Cir. 1976)).

Second, the "procedural default" rule bars the collateral review of claims that could have been raised on direct appeal, unless the petitioner shows cause for failing to raise the claims on direct review and actual "prejudice" or actual innocence.  See Bousley, 523 U.S. at 622-23 (citations omitted); see also Marone v. United States, 10 F.3d 65, 67 (2d Cir. 1993) ("In order to raise a claim that could have been raised on direct appeal, a § 2255 petitioner must show cause for failing to raise the claim at the appropriate time and prejudice from the alleged error.")  This rule does not apply to ineffective-assistance-of-counsel claims, which may be brought in a § 2255 motion regardless of whether they could have been raised, or were raised, on direct appeal.  See Massaro v. United States, 538 U.S. 500, 508-09, 123 S. Ct. 1690, 1696, 155 L. Ed. 2d 714 (2003).

Discovery in § 2255 proceedings is governed by Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts.  Leave of court is required

to engage in discovery, which may be granted for good cause.  See Rule 6 (a).  Such discovery is conducted under the Federal Rules of Criminal or Civil Procedure, or "in accordance with the practices and principles of law."[6] Id.  The party requesting discovery must provide reasons for the request, which must "include any proposed interrogatories and requests for admission, and must specify any requested documents."  Rule 6 (b).

A petitioner may also be entitled to an evidentiary hearing.  Section 2255 provides that a court shall hold an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  To determine whether a hearing is necessary, the court "must review the answer, any transcripts and records of prior proceedings, and any [additional materials submitted by the parties]."  Rule 8 (a).  If a hearing is necessary, the court must appoint an attorney to any moving party who qualifies for the appointment of counsel under 18 U.S.C. § 3006A.  See Rule 8 (c).  A hearing is generally warranted only where the petitioner establishes a plausible claim.  See Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009).

The Second Circuit has further described the standard for holding a § 2255 evidentiary hearing as follows:

> In ruling on a motion under § 2255, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255; see, e.g., Pham v. United States, 317 F.3d 178, 185 (2d Cir. 2003) (§ 2255 does not permit summary dismissals of motions that present facially valid claims).  However, the filing of a motion pursuant to § 2255 does not automatically entitle the movant to a hearing; that section does not imply that there must be a hearing where the allegations are "vague, conclusory, or palpably incredible."  Machibroda v. United States, 368 U.S. 487, 495, 82 S. Ct. 510, 7 L. Ed. 2d 473 (1962); see, e.g., Chang v. United States,

---

[6] "If necessary for effective discovery, the judge must appoint an attorney for a moving party who qualifies to have counsel appointed under 18 U.S.C. § 3006A."  Rule 6 (a).

> 250 F.3d 79, 85 (2d Cir. 2001). To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief. See, e.g., Machibroda, 368 U.S at 494, 82 S. Ct. 510; United States v. Aiello, 814 F.2d 109, 113-14 (2d Cir. 1987).

Gonzalez v. United States, 722 F.3d 118, 130-31 (2d Cir. 2013).

The petitioner bears the burden of proving entitlement to relief under § 2255 by a preponderance of the evidence. See Galviz Zapata v. United States, 431 F.3d 395, 399 (2d Cir. 2005) (citing Williams v. United States, 481 F.2d 339, 346 (2d Cir. 1973)); see also Triana v. United States, 205 F.3d 36, 30 (2d Cir. 2000).

## B.     Peters's Claims

Peters asserts a single ground in his petition: ineffective assistance of trial counsel.[7]   (See Docket No. 596, p. 4.)  But that single ground consists of 11 claims. Peters claims that trial counsel was ineffective for failing to (1) investigate and interview defense witnesses; (2) read material documents; (3) preserve a speedy-trial objection; (4) call certain defense witnesses; (5) properly define the conspiracy; (6) discuss evidence and strategy; (7) describe his businesses and limited involvement in the charged conduct; (8) seek sanctions against the prosecutors; (9) disclose a conflict-of-interest; (10) refrain from using an obscenity in front of the jury; and (11) use material evidence to counter the allegations against him. Id. These claims, none of which have merit, are addressed below.

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S.

---

[7] Two attorneys from the same retained firm represented Peters at trial. Peters rarely distinguishes between them in his claims, so for ease of discussion, this Court will refer to trial counsel in the singular.

CONST. amend VI. It is well established that "the right to counsel is the right to the effective assistance of counsel." Eze v. Senkowski, 321 F.3d 110, 124 (2d Cir. 2003) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970)).

Ineffective-assistance-of-counsel claims may be brought in a collateral proceeding under § 2255 regardless of whether they could have been raised, or were raised, on direct appeal.[8] See Massaro, 538 U.S. at 508-09. To succeed on his ineffective-assistance-of-counsel claims and to secure reversal of his convictions on the ground of inadequate legal representation, Peters must establish both prongs of the two-part test from Strickland v. Washington: (1) that his counsel's performance "fell below an objective standard of reasonableness;" and (2) that "the deficient performance prejudiced" him. 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

To satisfy the first prong of the Strickland test, Peters must establish that his counsel's conduct fell below "an objective standard of reasonableness" under "prevailing professional norms" such that it was "outside the wide range of professionally competent assistance." Id. at 688, 690. Under this prong, the court "must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and be watchful 'to eliminate the distorting effects of hindsight.'" Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001) (quoting Strickland, 466 U.S. at 689). This is because "[t]here are countless ways to provide effective assistance in any given case" and "[e]ven the best criminal defense attorneys would not defend a particular client in the

---

[8] As noted above, however, the mandate rule still applies. That is, ineffective-assistance-of-counsel claims that were raised and resolved on direct appeal, and any claims involving factual predicates that were impliedly rejected on direct appeal, are barred. See Yick Man Mui, 614 F.3d at 53-54 (citations omitted).

same way." Strickland, 466 U.S. at 689 (internal citation omitted). The question is ultimately "whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Harrington v. Richter, 562 U.S. 86, 105, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

To satisfy the second prong of the Strickland test, Peters must establish that his attorney's "deficient performance prejudiced the defense" such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See Strickland, 466 U.S. at 687, 694. The Second Circuit normally "requires some objective evidence other than defendant's assertions to establish prejudice," Pham v. United States, 317 F.3d 182, 182 (2d Cir. 2003), because "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding," Strickland, 466 U.S. at 693. Counsel's errors must have been "so serious as to deprive the defendant of a fair trial." Id. at 687.

Because both parts of the Strickland test must be satisfied for a petitioner to establish ineffective assistance of counsel, failure to satisfy one part of the test frees a district court from assessing whether the petitioner satisfied the other part of the test. Strickland, 466 U.S. at 697 (noting that a court need not "address both components of the [two-part Strickland] inquiry if the defendant makes an insufficient showing on one"); see also Stouse v. Leonardo, 928 F.2d 548, 556 (2d Cir. 1991).

Each of Peters's ineffective-assistance-of-counsel claims fails to meet the Strickland test.

**1. Peters's claims attacking trial counsel's performance fail.**

A court reviewing counsel's performance is "not permitted to use hindsight to second guess [counsel's] strategy choices," but that is precisely what Peters asks this Court to do. <u>Baran v. United States</u>, 160 F. Supp. 3d 591, 596 (S.D.N.Y. 2016) (quoting <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir. 1994)). Throughout his 71-page motion and memorandum, Peters reiterates his long-rejected version of events and claims of innocence. (Docket No. 596.) As he did unsuccessfully at trial and on appeal, Peters expounds on his belief that he did not engage in fraud, but rather, was the victim of it. But now in this posture, Peters drapes his retelling in the parlance of ineffectiveness, claiming that trial counsel failed to conduct the right investigation, employ the right strategy, call the right witnesses, ask the right questions, use the right evidence, and establish the right facts.[9] He invites this Court to second-guess counsel's strategic decisions, witness choices, lines of questioning, and handling of evidence based exclusively on his self-serving assumptions and speculation concerning what the evidence would have shown and what the witness testimony would have been.

For example, Peters maintains that counsel failed to properly investigate, read, and use certain documents that he claims would have changed the jury's verdict. These documents, none of which Peters provides a path of admissibility for, include (1) a January 19, 2000 memorandum about ITEC written by Kenneth Colwell from Ernst & Young; (2) Ernst & Young "work papers," including a 1998 Schedule of Audit Differences; (3) notes concerning Williams Technologies; (4) records from the Small Business Administration; (5) air travel records, and (6) Peters's personal notes. (<u>See</u> Docket No.

---

[9] This encompasses Claims 1, 2, 4, 5, 6, 7, and 11, as enumerated above.

596, pp. 11-33, 68-71.)  This argument is a variation of one Peters made previously: that these are material documents constituting newly discovered evidence warranting a new trial.[10]  (See Docket No. 479.)

In denying Peters's bid for a new trial, this Court also rejected the argument that Peters makes now—that the outcome of his trial would have been different if counsel had read, investigated, and offered these documents.   To the contrary, even assuming relevance and admissibility, this Court explicitly found that "[e]ven viewing the allegedly new evidence in Peters's favor, it can only be said that it would strengthen his defense—none of the evidence cited, viewed independently or cumulatively, would lead to an acquittal."  (Docket No. 537, p. 14.)  Nothing presented in the present motion changes that finding.  Thus, even assuming that Peters's counsel failed to read, investigate, or consider these documents, the result of the trial would not have been different.  Counsel was therefore not ineffective.  See Strickland, 466 U.S. at 687, 694.

Peters also maintains that counsel failed to call important witnesses and failed to pursue material lines of questioning, alleging that counsel did so to avoid a prolonged trial that would interfere with his planned vacation.  (Docket No. 596, pp. 65-66.)  Peters asserts, for example, that the following witnesses would have established his defense: Henry Kozial (Freed Maxick); Ken Colwell (Ernst & Young); Bill Plaar (Gregory Samer's assistant at WAPI/Bighorn); Joe Garbarino (WAPI/Bighorn operations manager); Jeff Anstett (IT manager for WAPI/Bighorn); Craig Miller (Manager of Data Processing at WAPI/Bighorn); Jerome Amman (Sales Manager for Bighorn); and Richard Marinucci (ITEC).  (Docket No. 596, pp. 44-52.)

---

[10] The air travel records and personal notes were not part of the motion for a new trial.

Peters also maintains that counsel should have pursued lines of questioning with multiple witnesses concerning the alleged destruction of evidence, see Docket No. 596, pp. 33-39; "highly suspect" transactions, id. p. 41; entities that were formed after the Companies became defunct, id. pp. 39-42; the alleged misconduct of his employees and co-conspirators, id. *passim*; and the practices of prebilling and "holding the month open," id. at pp. 52-57; to name but a few. Peters also contends that his own testimony should have been more expansive to include discussion of his notes, his observations, his limited role in the management of the Companies, his reliance on his employees, and his real estate development business. Id. pp. 59-62.

According to Peters, these witnesses and lines of questioning would have established that those around him were the true perpetrators of fraud and the architects of the scheme to loot the Companies, to his exclusion.

"'The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess.'" Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005) (quoting United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam)). "[C]ounsel's decision as to 'whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.'" United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (quoting United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997)). Moreover, counsel is not obligated to call every witness and pursue every issue or defense. See United States v. FNU LNU, Nos. 06-CR-172-LTS, 13-CV-3507-LTS, 2015 WL 5178438, at *5 (S.D.N.Y. Sept. 4, 2015) ("Counsel's alleged decision not to call certain witnesses and investigate certain defenses . . . are afforded a presumption of reasonableness, which Petitioner's

generalized assertions are insufficient to overcome.").

There may be myriad reasons why trial counsel did not present these witnesses or pursue the lines of questioning that Peters proposes, not the least of which is that the expected testimony may have been inconsistent with what Peters now represents it would have been. Peters offers no basis—by affidavits or otherwise—from which a reasonable person could conclude that any of the individuals he identifies would have testified in the manner he assumes. See Lee v. Cully, No. 09-CV-6502, 2011 WL 17931764, at *3 (W.D.N.Y. May 10, 2011) (finding that "the claims pertaining to the uncalled 'witnesses' are based only on [movant's] unsubstantiated allegations which are based upon mere speculation, unsupported by any affidavits from these witnesses. [Movant] has thus failed to demonstrate how his defense would have benefitted from the calling of these individuals in his defense by his counsel."); Ferrell v. United States, No. 08 Civ 8245, 2011 WL 1496339, at *4 (S.D.N.Y. Apr. 20, 2011) ("To demonstrate prejudice from counsel's alleged failure to call a witness, the petitioner must at least demonstrate that the witness was able to testify and would have testified in a manner beneficial to the petitioner.")

But even assuming that the evidence would have come in as Peters suggests, he has not shown that it would have changed the outcome of the proceeding. The evidence is cumulative of Peters's defense that he was the victim of, not the perpetrator of, the alleged fraudulent activity. The jury soundly rejected this contention, as did the Second Circuit, which found ample evidence that Peters had fraudulent intent and was personally involved in the fraudulent policies. Peters, 543 F. App'x. at 9. Peters presents no basis to conclude that the jury's determination would have been any different if presented with

this cumulative evidence.

And other than a bald accusation, Peters offers nothing from which a reasonable person could conclude that his lead lawyer, who spent the better part of eight weeks vigorously litigating the case, refused to call important witnesses or explore material lines of questioning so that he could go on vacation. Undermining this accusation, Peters admits that counsel "advised Peters that he had determined that it was, in his professional opinion, unnecessary to call the planned defense witnesses listed and submitted to the Court." (Docket No. 596, p. 65; <u>see also</u> Affidavit of Frank E. Peters, Docket No. 596, pp. 72-78, ¶¶ 23-24.) Peters further represents that counsel advised him that, in his opinion, only two witnesses should be called—Peters and Van Domelen—"based on [counsel's] opinion that the government's case was not proven and that the jury resented being on duty for such a long period." <u>Id.</u> Peters's accusation is insufficient to overcome the presumption of reasonableness that attaches to counsel's real-time assessment and performance. <u>See Aparicio</u>, 269 F.3d at 95. Consequently, this Court finds that counsel's conduct was not "outside the range of professionally competent assistance," and that the introduction of this evidence would not necessarily have changed the outcome of the trial. <u>Strickland</u>, 466 U.S. at 690, 694.

Finally, Peters has not demonstrated that counsel's strategic choices and alleged failure to employ strategies that Peters preferred were unreasonably deficient or deprived him of a fair trial (Docket No. 596, pp. 57-58). <u>See Taylor v. Illinois</u>, 484 U.S. 400, 417-18, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988) (attorney has authority to manage most aspects of the defense without obtaining his client's approval); <u>see also Sheehan v. United States</u>, 16-CV-6385, 2018 WL 1796548, at *2 (E.D.N.Y. Apr. 16, 2018) ("Second

guessing the tactical and strategic choices made by counsel is seldom appropriate."); Gilliam v. Artus, 653 F. Supp. 2d 315, 332-33 (W.D.N.Y. 2009) ("Although trial counsel has a duty to consult with a client regarding 'important decisions' . . . that obligation does not require counsel to obtain the defendant's consent to 'every tactical decision.'")

In all, these claims are the type the Strickland court warned about: "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential.").  This Court therefore finds that Peters fails to establish that counsel's trial performance fell below "an objective standard of reasonableness" under "prevailing professional norms" such that it was "outside the wide range of professionally competent assistance."  Id. at 688, 690.  Peters also fails to show that but for counsel's performance, the results of his trial would have been different.  Id. at 687, 694.  These claims therefore fail.

## 2. Trial counsel was not ineffective for allegedly failing to preserve a speedy-trial objection.

Peters next maintains that counsel failed to preserve a speedy-trial objection.  He represents that counsel unsuccessfully raised speedy-trial issues, but did not renew and preserve them before trial.  (See Docket No. 596, at p. 42-44.)  This claim is not borne out by the record.  First, no speedy-trial objections were lodged at any time, and Peters does not specifically cite any.  Second, if speedy-trial objections were in fact made and denied, the issue would have been preserved and Peters could have appealed.  Third, Peters does not identify any particular speedy-trial violation.  And finally, a review of the

record reveals that time was properly excluded under 18 U.S.C. § 3161 throughout the prosecution, leaving no prospects for a successful speedy-trial motion in the first instance. Accordingly, this claim of ineffectiveness also fails.

### 3. Trial counsel was not ineffective for failing to seek sanctions against the prosecutors.

Peters maintains that counsel was ineffective for failing to pursue sanctions or a mistrial after prosecutors allegedly violated this Court's "no-contact rule" by speaking to witness Richard Massaro, Jr., during a break while he was under continuing cross-examination. (See Docket No. 596, pp. 62-64; Affidavit of Frank E. Peters ("Peters Aff."), Docket No. 596, pp. 72-78, ¶¶ 2-22.) Peters alleges that during the break, Massaro and prosecutors had substantive conversations in the witness room and Massaro then lied about it. This is nothing but pure speculation.

No basis existed at trial to seek sanctions or a mistrial. In fact, Peters concedes that this Court reiterated the "no-contact rule," that counsel was not concerned about the government violating the rule (but was concerned about Massaro violating it), and that counsel examined Massaro about his contact with the prosecutors and Massaro testified that he had no contact with them. (Docket No. 596, pp. 62-64.)

The exchange at trial was as follows:

| | |
|---|---|
| Counsel: | . . . Before we do that, over the last break where did you go? |
| Massaro: | I went to floor number two. |
| Counsel: | Did you go to a specific room on floor number two? |
| Massaro: | Yes. |
| Counsel: | What room was that? |

| | |
|---|---|
| Massaro: | The offices of Mr. Bruce and Miss Wylegala [the prosecutors]. |
| Counsel: | Did you have any discussions with anyone in that office? |
| Massaro: | No. |
| Counsel: | Did anyone in that office say anything to you? |
| Massaro: | Yes. |
| Counsel: | Who spoke to you? |
| Massaro: | I believe her name is Sharon Knope [the witness coordinator]. |
| Counsel: | Okay. Anyone besides Miss Knope? |
| Massaro: | No. |

(Docket No. 592, pp. 165-66.)

There is simply no support whatsoever for Peter's claim that Massaro discussed his testimony with the prosecutors. The record, in fact, supports just the opposite. Massaro testified the he did not have any discussions with the prosecutors, and the prosecutors wholly deny improperly speaking with Massaro or engaging in any other unethical behavior. (See Affidavit of Gretchen L. Wylegala ("Wylegala Aff."), Docket No. 605, ¶¶ 2-6, 19.) Put simply, there was no basis to request or impose sanctions for violation of the "no-contact rule" at trial. Counsel was therefore not ineffective for failing to pursue that course.

### 4. Counsel's alleged conflict-of-interest does not constitute ineffective assistance of counsel.

Peters maintains that counsel failed to disclose an alleged conflict-of-interest arising from his law firm's past representation of Webb Associates, a Texas entity that

allegedly appraised the liquidation value of the Companies' inventory for Chase. Peters contends that Chase was displeased with Webb's appraisal and was contemplating litigation, at which point Webb retained counsel's firm.

Peters does not assert that the alleged conflict infringed his Sixth Amendment right to conflict-free counsel. See, e.g., United States v. Cohan, 798 F.3d 84, 88 (2d Cir. 2015). Rather, he claims that counsel failed to advise him that his firm represented Webb and failed to disclose information concerning Chase that counsel allegedly learned while representing Webb. Even assuming that counsel represented Webb in the past, which Peters provides no evidence of, Peters fails to explain how that representation negatively impacted his trial or resulted in him receiving ineffective assistance of counsel. Other than baldly alleging that counsel failed to share information concerning Chase, which counsel may not have been at liberty to share in any event, Peters makes no connection between this past representation in a civil matter and his criminal trial. Most certainly, he has not shown that but for this alleged conflict of interest, he would have been acquitted. This claim therefore fails.

### 5. Counsel's alleged use of an obscenity at trial does not constitute ineffective assistance of counsel.

Finally, Peters maintains that counsel was ineffective because he allegedly used an expletive during his closing argument. Peters represents that counsel, in "decrying" the evidence, said, ". . . are you kidding me? Are you fucking kidding me?" (See Peters Aff., ¶¶ 31-36.) Peters claims that this shocked the jury and prejudiced it against him. But like several of Peters's other claims, this one is factually deficient.

There is no record of counsel ever using the expletive that Peters attributes to him—this Court has no recollection of it; the prosecutors do not recall it (see Wylegala

Aff., Docket No. 605, ¶ 9); it is not contained in the trial transcript[11] (see Docket Nos. 307, 341); and co-counsel only *thought* he heard it (see Peters Aff., Exhibit A).  In any event, even assuming that the comment was made as Peters says it was, it was made in Peters's favor, with counsel forcefully "decrying the evidence."  And Peters makes no showing that the isolated use of an expletive by itself constitutes ineffectiveness.  As such, Peters fails to demonstrate that counsel's conduct fell "outside the wide range of professionally competent assistance" or caused him any prejudice.  His claim therefore fails.

## C.      No evidentiary hearing is required.

As indicated above, § 2255 provides that a court shall hold an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  Rule 4 (b) also provides that "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion . . . ."

Here, no evidentiary hearing is required because the motion and the record conclusively demonstrate that Peters is entitled to no relief under § 2255.  Consequently, this Court finds that no hearing is warranted or required.  See Orbach v. United States, 11 Cr. 111 (NRB), 2017 WL 5632815, at *7 (S.D.N.Y. Nov. 7, 2017) (denying request for a § 2255 hearing where "[t]he existing record is conclusive that petitioner is not entitled to relief on any theory presented to [the court]").

---

[11] In a separate motion, Peters unsuccessfully sought to recuse this Court on the grounds that it tampered with the trial transcript by surreptitiously removing the alleged expletive.  See United States v. Peters, 03-CR-211S (1), 2020 WL 830425 (W.D.N.Y. Feb. 20, 2020).

**D.      A certificate of appealability will not issue.**

For a certificate of appealability to issue, a petitioner must make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253 (c)(2).  To make the required "substantial showing," Peters must establish that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  Rhagi v. Artuz, 309 F.3d 103, 106 (2d Cir. 2002) (per curiam) (citations and internal quotation marks omitted).  Peters has made no such substantial showing of the denial of a constitutional right in this case.  A certificate of appealability will therefore not issue.

## IV. CONCLUSION

Having considered Peters's grounds for relief individually and cumulatively, and having presided over the trial of this matter, with opportunity to observe trial counsel first-hand, this Court finds that Peters has failed to carry his burden of showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to him] by the Sixth Amendment" or to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Harrington, 562 U.S. at 104 (quotations and citations omitted).  Peters's § 2255 motion must therefore be denied.

If Peters wishes to appeal, he must file a Notice of Appeal with the Clerk's Office, United States District Court, Western District of New York, within 60 days of the date of judgment in this action.  See Fed. R. App. P. 4 (a)(1)(B)(i).  Requests to proceed on appeal as a poor person, if any, must be filed with the United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules

of Appellate Procedure.

## V. ORDERS

IT HEREBY IS ORDERED, that Petitioner's Motion to Vacate, Set Aside or Correct his Sentence under 28 U.S.C. § 2255 (Docket No. 596) is DENIED.

FURTHER, that this Court hereby certifies, pursuant to 28 U.S.C. § 1915 (a)(3) and Rule 24 (a)(3) of the Federal Rules of Appellate Procedure, that any appeal from this Decision and Order would not be taken in good faith and therefore leave to appeal as a poor person is DENIED. See Coppedge v. United States, 369 U.S. 438, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

FURTHER, that a Certificate of Appealability under 28 U.S.C. § 2253 is DENIED.

FURTHER, that the Clerk of Court is directed to CLOSE 15-CV-505S.

SO ORDERED.

Dated:      March 1, 2020
               Buffalo, New York

s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge
